Mr. Chief Justice Watkins delivered the opinion of the Court. From the decree of the Pulaski circuit court rendered in this cause, both parties appealed. As we have much difficulty in arriving at a satisfactory conclusion upon all the questions argued by counsel, a statement of the case with reference to them, will best explain the grounds of our decision. In 1836, the General Assembly, by virtue of the constitutional provision authorizing the incorporation of a banking institution calculated to aid and promote the great agricultural interests of the country, and the faith and credit of the State to be pledged to raise the funds necessary to carry it into operation, provided such security could be given by the individual stockholders as would guaranty the State against loss or injury, incorporated the Real Estate Bank of the State of Arkansas, with a cash capital of $2,000,000, to be raised by loans or negotiations, on the security of real property, at its cash value, with the guaranty of the public credit, essentially a private corporation, but of whose existence and the legislation concerning it as public acts, this court has always judicially taken notice. The theory of the charter was that the stockholders subscribed their land instead of paying up the amount of their subscriptions in money. Each stockholder executed his bond to the corporation for the amount of stock awarded to him, and a mortgage upon his land to secure it, conditioned for the payment of all moneys received from the bank on account of subscriptions for stock, and for the final payment of the bonds to be issued by the State, and the interest thereon. For the quantity of bonds to be emitted by the State, these stock-bonds and mortgages were transferred, by the act of incorporation, to the State and the holders of the bonds which she might issue in virtue of that act. To facilitate the corporation in bof-rowing the amount of her cash capital, the charter provided for the issuance of two thousand bonds of the State, for one thousand dollars each, payable in twenty-five years, with interest semi-annually, to the order of the Bank, and negotiable upon the endorsement. By the sale of these bonds, the cash capital of the company was raised, designed to enable it to engage in a general banking business of deposite, discount and circulation. Each stockholder was a privileged borrower, or had a stock credit in bank to the amount of one-half of his stock, subject to be renewed and curtailed during a term of years. The bank was charged with the duty of paying the interest and principal of the bonds issued by the State, and all the profits expected to be realized from the business of the bank, by means of the authority given her to make discounts to double the amount of her capital, and at a rate of interest exceeding that to be paid on the bonds of the State, were required to accumulate and become capital, until the full and final payment of the bonds of the State, and all the responsibilities of the bank, when, and at the expiration of the charter, the remaining funds were to be divided as profits, ratably among the stockholders. Such, in general terms, (and only so stated as affecting any question arising in this cause,) was the machinery by which this bank was put into operation. Section 38, of the chapter, is as follows: “ The said corporation shall never suspend or refuse the pay ment, in current money of the United States, of any of its notes or obligations, or of any funds received by them in de-posite: and if ever the said corporation shall refuse or suspend the said payment, the bearer of any note or obligation, or any person having the right to demand or receive the amount of funds deposited, as above mentioned, shall be entitled to receive damages at the rate of ten per cent, per annum.” On the second of November, 1839, the bank being unable to redeem her circulation, suspended specie payments, and never afterwards resumed. This suspension, as said in the case of the State vs. The Real Estate Bank, (5 Ark. 604,) was a matter of public notoriety and general history. On the second day of April, 1842, the bank being in failing circumstances, and unable to meet the immediate demands upon her to pay specie upon the notes, or to discharge the interest accruing upon the bonds of the State, assigned all her property and assets for the purpose of paying her debts. In the case of Conway et al. Ex parte, (4 Ark. 302,) this assignment was adjudged to be valid : and in the case of the State vs. The Real Estate Bk. upon quo warranto, decided at January term, 1844, the Bank was adjudged to have forfeited her charter in consequence of having divested herself of her property, so as to become incapable of continuing the business of banking. In October, 1849, Daniel Ringo, the complainant in this cause, exhibited his bill against the defendants, who are the residuary trustees and successors of those originally named in the deed of assignment, alleging that he was the legal holder and owner of certain bills and notes, which are exhibited, issued by the bank, pursuant to her charter, and intended to circulate as money, some of which notes bear date, and were issued prior to the second day of November, 1839, and a portion of them in 1840, after the suspension ; that', on the 13th September, 1848, he had demanded payment of the Bank notes in question from the defendants, which was refused. It does not appear when the complainant became the holder- of these notes, or that he was the holder of them prior to the time that payment was demanded. The complainant states that, being, indebted to the Trustees in certain amounts, for which they held his obligations, he proposed, on the 21st September, 1848, and on the 25th April, 1849, to pay these obligations out of the notes of the Bank held by him, if the Trustees would allow him the damages he claimed upon them, being at the rate of ten per centum from the date of the notes, or from the time of suspension, and he tendered to the defendants an amount of the Bank notes with the damages so computed, sufficient to discharge each of his obligations respectively, which tender was refused. The bill sets out the deed of assignment, which is exhibited, and proceeds to allege, as breaches of trust, various acts of malfeasance and non-feasance on the paid of the defendants, and prays for discovery and account of the assets, which came to the hands of the trustees, that the deed of assignment may be enforced, and they decreed to pay to the complainant the amount of his demands “with damages thereon at the rate of ten per cent, per annum from the date of the notes issued by the Bank at the time of her suspension and refusal to pay the same in current money,” first deducting therefrom the amounts found to be due by the complainant to the Trustees, and for general relief. The answer of the defendants does not controvert any material allegation of the bill as above stated. There is, however, a point made in argument on both sides as to a matter of fact attending the demand, which we notice more for that, reason than because we consider it material either way. The bill states that, on the 13th September, 1848, the complainant demanded payment of the Bank notes in question from the cashier of the defendants ; and they answer admitting the demand, the complainant, as they say, at the same time, demanding damages on the notes at the rate often per cent, per annum from the time of the suspension. If we could presume that this fact rested within the personal knowledge of the defendants, their statement of it, in connection with the admission and as part of the res gestas of the tender and responsive to the bill, would have to be taken as true unless disproved. As it stands, we think the proof of it devolved on the defendants. It does not appear that the defendants, then or at any other time, offered to pay the complainant the face of the notes held by him, or that they made any effort to have their outstanding circulation presented by the holders for payment, or gave any notice that they were ready to pay it; but it is to be inferred that they were not, at any time since the execution of the deed of trust, prepared with means or willing to redeem the notes of the Bank with specie. It appears, from their answer, that two of their certificates given for notes deposited under the deed, and which by its terms were to be paid with six per cent, interest, in preference to notes not so presented, have not yet been paid. The answer states various causes, growing out of hostile legislation, conflicting decisions of the courts, and other untoward events, why they have not better succeeded in the execution of the trust. They waive any discovery or account concerning it by admitting assets in their hands, from which they will be able to realize a fund amply sufficient to satisfy any decree that may be rendered against them in the cause. The answer relies upon the deed of assignment as a justification to them for resisting the demand of the complainant. The cause was submitted on bill, answer, replication, and exhibits. The court decreed that the complainant was entitled to damages at the rate of ten per cent, per annum on the notes held by him from the time of the demand and not before : that consequently the tender made by him, including damages prior to that time, was not a good discharge of the debts owing by him to the Trustees ; and the gross amount of these debts, with interest, computed to the time of the decree, being deducted from the gross amount of the bank notes and damages due to the complainant, and so satisfied, a balance of $15,255 70, was foünd to be due from the Trustees to the complainant, and this amount they were decreed to pay him with accruing damages at the rate of ten per cent, per annum from the date of the decree until satisfied. We may then assume the main facts to be that, in November, 1839, the Bank notoriously suspended specie payments and never afterwards resumed. That, in April, 1842, she assigned all hex-property to Trustees for the payment of her debts. That, in 1844, the chai-ter of the Bank was declared to be forfeited; that, on the 13th September, 1848, the complainant is shown to be the owner and holder of cei-tain notes of the Bank, issued for circulation as money, some of which were issued pi-ioi-, and a portion of them subsequent, to the date of the suspension; that he then demanded payment of them from the Trustees, which was refused; that they were not then, or at any other time since the execution of the deed of assignment, prepared with specie means, or willing to have paid the notes in question. And it is to be determined first, whether, under the provisions of the deed of assignment, the Trustees are under any obligation to pay the amount of these notes to the complainant in specie; and, if so, secondly, whether the complainant is entitled to any interest or damages upon the notes, and from what period is he so entitled. The object of the assignment is recited in the preamble of the deed, quoting the resolution of the central board, as follows : “ That this Bank is at present unable to pay the immediate demands upon it, to resume the payment of specie on its notes, to meet the interest upon the bonds of the State issued to it, or to protect its debtors from harrassment and oppression, by the holders of its notes ; and it is deemed just and reasonable that its creditors should be secured, paid, and indemnified, and its circulation called in, and at the same time its debtors guarded against oppression and ruin, and enabled to discharge the debts due by them to the institution.” The resolution then proceeded to authorize the deed of assignment to be prepared and executed, so that the affairs of the Bank should be placed in liquidation, its assets collected, and its debts" and liabilities paid “ in a certain order to be in said assignment provided,” and which, when approved by the board, should be duly executed and take effect. The material provisions of the deed bearing upon the case now before the court, are as follows : The conveyance is upon trust that the assignees will diligently endeavor to secure and collect the debts due the bank, and appropriate all moneys so received: First. In paying, “in Arkansas Bank notes,” any balance of salaries or compensation due to officers, agents, &c., of the Bank : Second. In paying all deposites in the same kind of funds in which they were deposited, and balances on the books of the Bank due to other banks or individuals. All which liabilities of the first and second class were to be paid, in the order named, in full and as soon as claimed or demanded. Third. “In calling in and redeeming the outstanding circulation, or notes payable of said Bank, to be taken in and paid in the manner hereinafter provided : ” Fourth. In paying the interest on the State bonds issued to that Bank, except certain hypothecated bonds: Fifth. In paying bonuses to the State, as they should become due, in accordance with the provisions of the charter : Sixth. In paying the principal of the State bonds aforesaid with the like exception as to those hypothecated: Seventh. In paying what might be justly due on the 500 bonds of the State which had been hypothe-cated. “ Which liabilities of said fourth and six classes, respectively, in case there should not be sufficient assets to pay the whole of the liabilities in either said fourth or six class, shall be paid respectively after all liabilities in prior classes are paid, ra-tably and in proportion to the amounts due to each holder of said bonds, the payment of which is so provided for without any preference or priority.” And upon the trust also that the assignees “ shall diligently endeavor to call in and redeem the circulation or notes payable of said Bank as speedily as may be possible, to which end they may grant and issue to every person who shall deliver to them notes of said Bank to the amount of $100, or upwards, a certificate of deposite for the amount so delivered, bearing interest at the rate of six per cent, per annum; and all such depositors, who may make such deposites within twelve months from the date of these presents, shall be preferred over all other holders of the circulation of said Bank, and shall be paid by said Trustees in preference to any other such holders of said circulation, out of the first good funds received; after said liabilities of the first and second class are discharged, the amount of their respective certificates of deposite, ratably and in proportion to Bthe amounts of the certificates of deposite of each respectively, without any preference or priority.” The mass of the debts due to the bank were to be so curtailed and renewed from time to time as to be collected in eight years, and the deed provided that the notes of the Bank should be received if offered at par in payment of all debts due to it, except that in certain cases where the debtors were attempting, or should do so, to defend against and altogether avoid the payment of their debts to the Bank, the Trustees, in their discretion, might require the same to be paid in specie. It would appear, from the report of the case of Conway ex parte, that, when the assignment was made, the circulation of the Bank was near $500,000, and her total liabilities,, including the State bonds negotiated by her, were about $2,250,000, and assets were about the same or a fraction more. The first and second classes of debts provided for in the deed of assignment, may be regarded as unimportant. Upon the construction of the deed of assignment, it is argued for the Trustees that it is the law for their government; that, under it, they were only authorized to call in the circulation by receiving it in payment of debts, and to pay it when deposited in accordance with the terms of the deed, and that consequently they are not bound to pay the demand of the complainant at all. The broad ground is taken that the deed of assignment is valid; that the Bank had the right to make preferences among the creditors, that the bond-holders are a more meritorious class of creditors than the complainant, who, for aught that appears, may have purchased the notes held by him at a discount, and that in the position he occupies, he cannot be paid at all, or if paid is to be postponed to the other classes. We are embarrassed by the positions here taken, because of the decision of this court in Conway Ex parte, holding the deed of assignment to be valid, which we could not do, as against any one not a party to that suit or bound by the adjudication, if the deed is to receive the construction here claimed for it. It is now well settled that a corporation, unless restricted by its charter, is prevented by the operation of some bankrupt or insolvent law, by virtue of its general power to contract, may well make an assignment of its effects, entire or partial, if made bona fide for the payment of its debts, the same as any natural person may do, and the corporation has the same right to make preferences among its creditors, of particular creditors, or classes of creditors: and such preferences, when they are meritorious, so far from furnishing an argument against the deed, conduce rather to uphold it. And oppressive as it might seem, there was no obligation upon the central board to provide in the deed, that the notes of the bank should be received in payment of debts due to her. On the contrary, if the object was, in contemplation of insolvency, an equal and fair distribution among her creditors, in order to attain that object, the notes could not have been so received, unless so held by the debtors as to become legally the subject of set-off, and the note holders would have to receive their dividends out of the assets, as other creditors. But we have examined every case within our reach, drawing in question the power of corporations to make assignments, and the validity of such assignments, and we do not find it any where intimated, much less decided, that a corporation has any anthority to make an assignment, in its terms, or in effect, contrary to the provisions of the charter, which, as in the case before the court, is to these trustees, a higher law than the deed of assignment. The question is, who are the creditors of the bank, and, in view of a preference, in what order could she lawfully provide for their payment? The vitality of a Bank depends upon its credit and ability to pay its deposites, and redeem its circulation designed to fulfil the office of. money. We leave out of view the tacit equitable preference to compensation of the servants engaged in her employment. And it would be so understood of the charter, according to all theory and banking usage, even if it did not expressly, and by a stringent penal sanction, injoin it, that the bank should not suspend, or refuse the payment in coin of her circulation and deposites. If this had been an ordinary bank, with an original cash capital paid in by the stockholders, and the deed had proceeded to recognize them as creditors of the bank and entitled to any preference over the depositors or note holders, the provision would be so preposterous as to stamp it at once with the character of fraud. In one sense, every man is a trustee of his property for the benefit of his creditors. So, partnership assets, if marshaled, first go to extinguish partnership debts. And in view of the distinguishing feature of corporations, at once a protection to the stockholders and an inducement for the combination of private capital, that the corporators are not individually liable beyond the amount of their stock, and that, in the absence of fraud, the assets of the corporation are the only fund to which her creditors can resort for payment, there is reason to hold the assets of the corporation to be a trust fund for the payment of her'debts. The difficulty here grows out of the peculiar organization of the Bank. If we suppose that the stockholders in fact subscribed their stock in land upon bond and mortgage, and had sold these bonds and mortgages in order to raise théir cash capital, the holders of those bonds would indeed have been creditors; but if, by the deed of assignment, they had been first paid or preferred, the effect would be to prefer the stockholders by releasing their lands fro tanto, and none the less a fraud because attempted to be done indirectly, under pretence of paying the bond-holders. The relative rights of the creditors of the Bank are not changed by the intervention of thé State. Legally, she is the party primarily liable upon the bonds to the holders of them ; equitably, she is to be regarded as having loaned her credit, by making her bonds for the accommodation of the Bank, who is the primary debtor. The bond-holders, in default of the Bank, may look to the State for payment. They had the solemn guaranty of her faith and' credit for advancing their money to the Bank, in addition to the security afforded by the stock-bonds and mortgages, designed as the ultimate means for paying the bonds of the State, and as an indemnity to the State for the loan of her bonds to the company. The bond-holders are indeed meritorious creditors, and so would the State become, if subro-gated to their rights by the payment of any of the bonds. But for what purpose did they become so ? Obviously, as said in Dawson vs. The Real Estate Bank, (5 Ark. 288,) the Bank received the'fundsthus raised by the sale of the stock-bonds, and “held them legally in her custody to be used and applied by her exclusively to the legitimate objects of banking, according to the common usages and practice of similar institutions,” differing only in this, that the charter contemplated loans or discounts on long credits to favor the agricultural interests of the people. The whole interest and object of this circuitous transaction was, that those who purchased the State bonds, endorsed by the Bank,should furnish the cash capital, to enable her to engage in the business of banking. The stock-mortgages were accepted as security for the payment or refunding of the cash capital. As to all other assets of the Bank, the bond-holders and the State stand, precisely in the attitude of the stock-holders, in any contest for preference between them and the creditors of the Bank. In this position, they are not creditors, though after the creditors are paid and as between them and the stock-holders they become creditors, and are entitled to all the remaining assets. So the deed here contains a provision that the assignees might turn over all the assets to the bond-holders, on the condition that they would assume all the liabilities of the Bank. And in no other wa}? could it have been done. Without such a condition, the bond-holders would have become trustees for the creditors, to the same extent that the Bank or her assignees were. So far as rights vested under the charter, they could not be divested or impaired by any act of the Legislature, and it would be extraordinary if the corporation, by making the assignment, could exercise powers which the Legislature had no power to confer. The case of Wilson vs. Biscoe, (6 Eng. R. 44,) overruling Duncan vs. Biscoe, (2 Eng. 175,) and fraught with momentous consequences to these Trustees, decides that the condition in the stock-mortgages to secure stock-loans, may be foreclosed by them, and the property sold, as under a junior mortgage, and subject to and without impairing the ultimate and paramount lien of the condition to secure the State and the bond-holders, and that decision •rests upon the ground that the assignees succeeded to all the rights of the Bank for the sale or recovery of her property and assets.- We are now called upon to decide that the Trustees also succeeded to the liabilities of the Bank, and hold her assets charged with the payment of her debts. True, the Bank, in making the assignment, might well prefer those holders of her notes who were-willing to come forward and deposite them, and accept certificates with six per cent, interest. But she could not compel any creditor, who chose to run the risk of a failure of assets, to forego any part of his claim or demand against the Bank or her assets. He might be postponed, but he could no more be deprived of his recourse upon any surplus of assets that might remain after the preferred creditors were paid, than a bond-holder could be excluded from his right of recourse upon the stock-mortgages. If it was the intention of this deed of assignment to exclude or postpone any one who became a creditor of the Bank, growing out of transactions in the course of her banking business, in favor of the bond-holders who advanced the original cash capital, for which the stock-mortgages are liable, it is the same in effect as if the Bank had made the assignment for the benefit of her own stock-holders. Leaning in favor of that construction of the deed of assignment which will uphold it. rather than in favor of the argument which would overthrow it, we think that such an intention is not manifested by the provisions of the deed before stated. Unless we come to this conclusion, there would be no alternative left but to declare the deed of assignment to .be fraudulent and void as against this complainant. In the consideration, then, of the remaining questions in this case, we take it as settled, that, as any holder of the bills or negotiable security had a right of action at law against the Bank for a breach of the contract, he is entitled to follow the assets in the hands of the Trustees, and subject them by proceeding in equity to the payment of his demands. The answer admits assets, and no question arises as to whether, by the terms of the deed, he is postponed to other creditors, or excluded for want of assets. We take italso that anyrightto recover interest or damages, which became attached to the notes in consequence of the suspension or refusal to pay them, was transferable with the notes, and passed by delivery to any holder. The question is, what are the demands of the complainant, and what interest or damages is he lawfully entitled to recover. The notes issued by the Bank were in the usual form of bank bills, being a promise on the part af the Bank to pay a certain sum to A. B. or bearer, on demand, at the principal bank at Little Rock. So, the notes in question were variouslymade payable at. ibe principal bank, or at her branch bank or office at Washington, Helena, or Columbia. It must be regarded as the settled law of this State that, where a promissory note or bill of exchange is made payable at a certain time, at a certain place, no presentment or demand at that time or place is necessary to charge the maker or acceptor, but it is matter of defence for him to show that he had the money ready at the time and place specified to pay the bill or note; and this defence is not in bar or extinguishment of the note, but operates as an ordinary tender to stop interest, damages, or costs. Sumner vs. Ford, 3 Ark. 387. So it is settled that, a note payable on demand, is due presently: no demand is necessary other than by the suit, and as there was an immediate right to sue, the statute of limitations begins to run from the making of the note. And since the case of Pullen vs. Chase, (4 Ark. 210,) approved in Causin vs. Taylor, (Ib. 408,) and Walker vs. Wills, (5 Ark. 166,) we are to understand the law to be that, a note payable, on demand, bears interest from date, and not from the time it may be demanded. It is to be observed of the propositions thus stated to be law, that they were not settled until after a long course of conflicting decisions, in which opposite opinions were held by judges and writers on either side of eminent ability, and that the course of decisions in this country, is, in some respects, the reverse of what it has been in England. The general propositions stated may be subject to many modifications and distinctions, one of which is to be noticed as bearing upon the case now under consideration : that is, between a note payable at a certain time and place, and one payable on demand at a particular place. Almost every rule of law, however unreasonable it may appear, ceases to be so when once it is firmly established, and so can be conformed to. With us, it is> understood by the parties that, to require a demand before suit, the contract to pay money must specify that it is to be paid on presentation, or at a certain time after demand, or some words indicating their intention that the accrual of the cause of action, the commencement of the bar by limitation and the liability for interest, depend upon some act to be done in futuro. Whenever we say that a promise to pay on demand imports a present duty without request, the liability to pay interest follows, not as an illogical consequence of the right to sue, and the accrual of the statute bar, without any dev mand, but as a necessary consequence of our statute concerning interest, which does not impliedly allow it by prohibiting interest beyond a certain rate to be reserved, or leave it to the courts to determine upon what contracts it may be allowed, but expressly allows it as a fair and just compensation for the use by one man of another man’s money, and specifies the classes of contracts, express or implied, to which it shall apply. This has been the law of Arkansas territory ever since its organization. (Steele & McCamp. Dig. 310. Acts of 1836, p. 142. Rev. Stat. of 1839, title Interest.) And while we are much impressed, even in view of our statute, with the argument of Spencer, Senator, in Renssalaer Glass Factory vs. Reed, (5 Cowen 604,) against the allowv anee of interest not expressly agreed for on cash advances, where there was a mutual account of debits and credits without any balance being struck, or an account rendered, there can be no doubt, under the statute, that whenever we say that a debt payable on demand is due presently, interest follows as upon any account stated or liquidated. When negotiable securities came in vogue, the debtor seeing that he could not know who was to become his creditor, underv took to protect himself against the common law obligation upon him to hunt up his creditor and pay him at the time appointed, by stipulating also that he should be bound to pay at a certain place. The American courts have given, as we think, the equiv table construction of such a contract, by dischárging the debtor from all liability for damages or costs, if he can show that he was ready to pay the money at the time and place appointed, while the creditor is not subjected to the risk of forfeiting his dev mand by the mere neglect or failure to present it. This expresv sion is used, because, under our statute, a promise in writing, though not under seal, imports a consideration, and the better opinion is, that it is a merger of the simple contract liability, and must be the foundation of the action. And if, as argued by Judge .Stokst, in his treatise on promissory notes, (sec. 228, note,) in commenting on the case of Wallace vs. McConnell, (13 Pet. 136,) the holder, according to the English doctrine, does not hazard the loss of the debt by failing to present it at the time and place specified, but he may charge the maker by a presentment there at any subsequent time, it would seem to follow that such a note is not payable at any certain time and place, but is demandable at the pleasure of the holder. Judge Stoey, whose decision in Picquet vs. Curtis, (1 Sumner 478,) is overruled by the decision in 13 Peter's, evidently leans in favor of the decision in Rowe v. Young, (2 Prod. & Bing. 165,) which was against the opinion of a majority of the judges, and soon after modified by act of Parliament as to bills of exchange. The language of the court in Wallace vs. McConnell, and other cases cited by Judge Stouy in the note referred to— Carley vs. Vance, 17 Mass. 337; see also Eastman vs. Fifield, 3 N. Hamp. 333, and Armistead vs. Armistead, 10 Leigh ;523 — certainly do take it for granted that if a note he made payable on demand, at a particular place, a demand must be made .at the placebefore suit brought. Butin no one of those cases was the point directly involved, so that it could be adjudicated. Chancellor Kent, who leans the same way, takes the distinction, that in such case a demand must be made before suit, (3 Com. 98,) citing in support of Caldwell vs. Cassidy, (8 Cow. 271;) and overruling Haxleen vs. Bishop, (13 Wend. 1,) where C.J. Savage, referring to his own decision in Caldwell vs. Cassidy, says: “In that case, I remarked that, in case of a note payable on demand at ,a certain place, (a bank, note for instance,) I thought a demand would be necessary, and referred to 5 T. R. 30, and 16 East 112, {Dickinson vs. Bowes;) and such I still think is the law in England at the present day, as appears from the cases cited in regard to all promissory notes, when the place of payment forms a part of the note itself. In this court, however, we hold that, on such note a demand, at the place of payment, is not necessary; but if the maker was at the place of payment, with funds to pay the note, that fact is a good defence against interest and costs ; provided the defendant avails himself of the defence by pleading it and bringing the money into court.” And so it was decided in McKinney vs. Whipple, (21 Maine 98,) and Montgomery v. Elliott, (6 Ala. 701.) The shape in which the question was presented in Haxleen vs. Bishop, is the same in effect as in a suit against a-bank by the holder of her notes; and C.J. Savage considered that bank notes are promissory notes, and actions founded upon them-are governed by the same rules. So far as the decision- of this question is involved in the case now before the court, we should-have to hold, by analogy with the American cases, that there is no distinction-, as to presentment before suit, in order to charge the maker, between a note payable on demand at a particular place and one payable at a specified time and place. This looks indeed very much as if the law had undertaken to make a different contract for the parties, and would only be tolerable but for the exemption allowed to the defendant in all such cases. As said in Haxleen vs. Bishop, “ if the defendant pleads that when the demand was made, that is when- the suit was commenced, he was ready at the place mentioned in the note to make payment, and brings the money into court, he discharges himself from interest and costs.” The question is, how fardo these rules in all their scope apply to banknotes? They are,itis true, but promises to pay money, which may be sued upon as ordinary promissory notes. But, in other respects, there are material distinctions. Bank notes are intended to circulate as money, being a representative or substitute for it: when passing current, they are a legal tender if not objected to. They are, for some purposes, regarded as property, and not as choses in action, being, subject to execution, (Rev. Stat., title Execution, sec. 25,) and to be attached, (State vs. Lawson, 2 Eng. 391.) Being payable to bearer, they pass by delivery, and admit of no question as to the liability of endorsers as in ordinary negotiable paper, or of any equitable set-off under the statute of assignments. In 1840, the notes of the two banks chartered in this State were the common medium of circulation, (Dillard vs. Evans, 4 Ark. R. 175;) were receivable for taxes and disbursed from the Treasury in payment of the salaries of public officers until 1845. (Acts of 1844, p. 92-3.) They are expressly exempt from the operation of the statute of limitations. (Rev. Stat., title Limitations, sec. 22.) As the Bank could not avail herself of this defence, and as the notes were subject to be paid in and re-issued, in the daily transactions of the Bank, the date of the bill would hardly be considered as even prima facie evidence of the time when the contract which the bill purported on its face, was made between the Bank and any holder. No reasoning on which the case of Pullen vs. Chase, was decided, that a note payable on demand bears interest from date, can apply to a note issued by a bank for circulation. Every holder of a bank note takes it with the implied understanding that he is to receive payment at the place specified in it, usually the office where the corporation, an artificial person, and essentially local, transacts its business. True, according to the doctrine of the American cases, which we have adhered to, he may sue without demand, the suit in such case being the demand. The demand may not be a condition precedent to his right to sue, but the demand or suit is necessary to entitle him to interest in consequence of the failure or inability of the bank to pay at the time of the demand. We have met with no case where the contrary was decided or intimated. The repeated decisions of this court, that, under the charters of these banks, they could sue and be sued, upon contracts entered into with the branches, or to be performed there, would, without reference to the concentration of the assets at Little Rock by the deed of assignment, disembarrasses the case of any question arising out of the fact that some of these notes were issued, or made payable at the branches. We have considered that the Trustees equitably succeeded to all the liabilities as well as the rights of the Bank; and our opinion is that, upon general principles affecting all contracts, not restricted by the clear and unambiguous terms of any statute, the complainant is entitled to lawful interest at the rate of six per cent, per annum from the 13th of September, 1848, upon the amount of the notes in question, of which he then demanded payment of the assignees. Under the provisions .of the charter before quoted, the complainant insists that he is entitled to receive damages at the rate of ten per cent, per annum, from the time of the suspension, on the amount of the notes now in suit, and this without reference' to whether he was the holder of them at that time, as that fact does not appear upon this record'. Our opinion is that this- provision was designed as a penalty, to be imposed on the Bank for any suspension or refusal to redeem its notes or pay its deposites. The holder of the notes is entitled to receive damages, in addition to the rate of interest, which follows as a legal consequence of the failure to pay on demand. The policy of this penalty was to deter the Bank from a suspension, the greatest breach of duty which a bank can commit, and a violation of the very end and object of its creation,- and in the event of such suspension to give to the holders of' its notes some compensation for their delay, and the loss in the depreciation of its paper, that usually follows upon- the suspension of a bank. Neither the compensation ton the one hand, or the penalty on the other hand, can be regarded as excessive. As said in Wilson vs. Biscoe, “We are called upon to construe the charter granted by the Legislature, and in doing, so, we consider it as it was intended to be. without reference to its present condition. If that could have been foreseen, it is evident the charter would not have been granted.” In the case of Wendall vs. Washington and Warren Bank, (5 Cowen 161,) the provision of the charter was that the Bank should be liable to pay, for all bills, notes, &e., the payment of which shall have been demanded and not paid in specie, damages at the rate of ten per cent, per annum until they shall be paid or otherwise satisfied. The supreme court of New York- treated it as a penalty, analogous to damages on protested foreign bills of exchange, and in addition to the damages, allowed lawful interest at 7 per cent, on the amount. Such a construction of the charter could not have been deemed oppressive, because she would be receiving eight per cent.upon discounts, and ten per cent, interest on all debts due to her after maturity. (Buford vs. The Real Estate Bank, 4 Ark. 520. State Bank vs. Clark, 2 Ark. 375.) Without such a penalty, the suspension, would have worked a forfeiture of the charter, and in that case, it might become of the utmost importance to the Bank to enable it to avoid- a forfeiture. In State vs. R. E. Bank on quo warranto, the court distinctly put it u-pon this ground. They say : “ This section of the charter provides for damages for suspension of specie payments, and consequently that is the only penalty that the Legislature intended to annex to the contemplated act. With the impolicy and injustice of such a provision, we have nothing to do. The Legislature has thought proper to make it one of the conditions of the grant, and we are to obey and respect its will.” See also The Commercial Bank of Natchez vs. The State, (6 Smedes & Marsh. 618,) The State vs. The Commercial Bank, (10 Ohio 538.) In The Bank of Kentucky vs. Thornsberry, (3 B. Mon. 522,) the charter made the bank liable to pay damages at the rate of 12 per cent., per annum on its notes, &c., from the time of failure to redeem them with, specie when demanded. The plaintiff recovered the amount of the notes and the twelve per cent, damages. His eminent counsel evidently regarded the damages as a penalty by moving to allow legal interest in addition. This was refused, and, upon the appeal of the Bank, the question was not raised, and the case went off upon the ground that the plaintiff had not made a bona fide demand of payment. But there, the court might well have refused the claim for interest in addition to the damages, because, by the charter, the suspension-or. refusal to pay specie, also worked a forfeiture of the charter, and the damages were not. intended to be in lieu of a forfeiture. Our best judgment is that the provision in the charter, of this Bank, to make it effectual as a penalty, was intended to be in addition to the legal interest of six per cent, allowed upon all debts or balances from the time they became due, and not in lieu or exclusion of it. For reasons not necessary to be enlarged upon, we think our conclusion is not affected by any thing in McFarland vs. The State Bank, (4 Ark. R. 410.) And upon tbe whole scope and prayer of the bill, the facts on both sides being plainly admitted, as said in the State Bank vs. Clark, (2 Ark. R. 375,) it is the duty of the court to know what interest or damages the complainant is entitled to, and decree accordingly. But we think the complainant is not legally, or equitably, entitled to the damages claimed prior to the demand. In order to present this question, most strongly in his favor, let it be supposed that he was the holder of these bills at the time of the suspension, and ever since. We have endeavored to state the reasons why the American decisions, upon contracts between individuals, as to the liability of the maker of a note payable on demand at a particular place, to pay interest from date, ought not to apply to similar notes issued by a bank to circulate as money: and unless controlled by the language of the section referred to in the chai'ter, the same reasons apply to the penalty given in the shape of accruing interest. True, the bank was required to be always prepared to redeem her circulation; and, by the words of that section, if ever she suspended, the owner of any of her notes would be entitled to receive the damages, but if the literal construction claimed for it would make the penalty a harsh and unjust, instead of a wholesome one, it ought not to be given. The framers of this charter must have supposed that, in case of a suspension, the holders of the bills would be prompt in asserting their rights. Vigilance would not only be their true interest, but they owed it as an act of justice to the other creditors, and to the hank and her assignees in liquidation. According to Thornsberry vs. The Bank of Kentucky, the intent of the provision there was not to enable the holder of the notes to put them upon twelve per cent, interest, without a clear and unequivocal demand of payment. True, the charterof that bank required payment to be demanded, but according to our view, this istmderstood of allbanknotes. Theutmostwehavesaidis,thattbeholdermay sue without demand, the suit in such case being a demand, and a .distinct notification to the bank of who is the holder of the notes. If the case cited of Farmers' & Merchants’ Bank vs. Planter s’ Bank, (10 Gill. & John. 422.) lias any bearing upon the one now before the court, it being a suit for a balance of account .claimed to be due on mutual dealings, it is that where a bank gives public notice of a suspension, a demand of payment at her .counter is dispensed with. We imagine the complainant would not insist upon the entire application to this case of that decision, the gist of which was that as there was a present right to sue, immediately upon the suspension, the statute of limitations then commenced running in favor of the bank. So we would hold that a party may dispense with any condition precedent in his favor. The law does not require of any one to do a vain or useless thing. We would no more hold a demand upon a notoriously broken bank to be necessary to prove that its notes would not be paid, than we would hojd the demand and refusal in trover to be the conversion, instead of being merely evidence of it. But that is not the point here. The equity of the case is that, without a demand, or a demand by suit, the bank, or her assignees, would not know who were the holders of h.er notes, or what of the notes issued by her had been lost or worn out by time. Here was a party holding up the notes for nine years, without even signifying to her that he was the person to whom payment was to be m.ade, and who would claim the damages. Was it expected that he should receive all the arrears of damages, and that the Bank or her assignees in liquidation should hoard up the means without interest or benefit from them during that period, ta pay an unknown holder when he should present himself? As the bar of limitation was not available to the Bank on her notes, there could be no protection to her or her assignees without a demand or suit. 'When thus demanded, and not until then, the bank notes lost their quality as a circulating medium ; then they became in all respects choses in action, identified, set apart, and*tvithdrawn from circulation. The sensible construction of that clause in the charter is, that, after the suspension, any bearer of the note was well entitled to receive the damages specified, but, in order to fix the liability of the Bank to him as the bearer of any particular note, it was necessary that he should make himself known to her as such by demand or suit. In coming to this conclusion, we are not much influenced by the case of Bartlett vs. The New Orleans Canal & Banking Co., (1 Rob. R. 543,) cited by the counsel on behalf of the Trustees. There, the provision of the charter was, that if the Bank should, at any time, suspend or refuse payment, &c., of its notes, the holder of any such note “shall be entitled to receive interest thereon from the time of such suspension or j'efusal, until the same shall be fully paid at the rate of twelve per cent, per annum.” The decision was that the plaintiff was only entitled to interest from the demand. The decision must have been influenced by the general law of that State, where, unless recently changed by statute, the rule in Rowe vs. Young, as to presentment or demand, as a condition precedent to suit against the maker, has been strictly adhered to. (See 10 Robinson 533.) And it is singular that, in the subsequent case of The New Orleans Improvement and Banking Company, (4 Annual Rep. 471,) it appears that Judge Strawbridge, upon a similar provision and in the face of that decision, had allowed the interest to be computed from the time of the suspension. If the charter here had contained a provision couched in such language, we should find it very difficult to give it that construction; but might have to treat it, not as a penalty in addition to interest, depending upon demand or suit by the holder, to put the bank in default, but as interest from the time of suspension. The case of Atwood vs. Bank of Chillicothe, (10 Ohio 526,) is mainly relied on by the counsel for complainant. By statute in that State, applicable to all banks, it was provided that, in all actions brought against any bank or banker to recover money due on the bills or notes issued by them, “ the plaintiff may file his declaration for money had and received generally, and, on trial, may give in evidence, to support the action, any notes or bills of such bank or banker, which said plaintiff may hold at the time of trial, and may recover the amount thereof with interest from the time the same shall have been presented for payment, and payment thereof refused, or from the time such bank or banker refused to redeem his notes with good and lawful money of the United States;” and went on to provide that when any such bank or banker resumed specie payments, the interest on their notes should cease from that period. The case was, that, on the 19th April, 1841, the bank suspended; on the 21st, the plaintiff demanded payment of certain notes, and immediately brought suit. On the trial, he offered, in evidence, the notes demanded and a large amount of other notes which he had acquired since the commencement of the suit. The court allowed interest on all the motes from the time of the suspension; and, in view of their statute, and the history of it as given by the court, we do not see how they could have decided differently. The opinion is well argued, and no fault is to be found with it, but we think the statement of the case is sufficient to show that it was not to be followed as a precedent for the construction of the charter here. We may say of section 38, upon which this controversy hinges, as this coprt said of the entire .charter in The State vs. Ashley, (1 Ark. 542,) that “ it is exceedingly vague and uncertain,” We have endeavored to state fairly any fact claimed by either party as material to influence the decision, so that the premises being-seen, it may be understood whether our judgment follows as a legitimate conclusion. The judgment of the court will be, that, upon the appeal of the Trustees, the decree of the court below is affirmed with costs. That, upon the appeal of R/ingo, the decree is reversed with costs: and that the cause be remanded, with instructions to the court below to deduct from the amount of the notes of the Bank described in the bill the total amount due to the Trustees upon the note of the complainant, Frederic W. Trapnall and John W. Cocke on the 13th September, 1848, and to allow the complainant lawful interest and damages in addition at the rate of ten per cent, per annum on the residue from that date until the 1st January, 1849, and deduct, from the gross amount then due to the complainant, the amount of 'the note of the complainant and F. W. Trapnall mentioned ip the bill, and in like manner to ah low the complainant interest and damages on the residue from that time until the accrual of the third debt mentioned in the bill, from the complainant to the Trustees, and if need be to order a reference to the master to ascertain the amount of the last mentioned debt, and when it accrued, and so, in like manner, deduct the amount of it when ascertained, and at the time it accrued, from the gross amount then due to the'complainant, and to decree that the defendants pay to the complainant the residue then remaining due to him, with interest and damages at the rate aforesaid from that time until satisfied. In making such computation, in case any one or more of the credits shall not be sufficient to extinguish the amount of the interest and damages then accrued, any residue of such interest and damages shall not be added to the principal. And the circuit court, in entering the decree, will require the notes of the Bank, described in the complainant’s bill,, to be brought into court and canceled.